UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 11-150 (JRT/JSM)

      Plaintiff,

v.                                           REPORT AND RECOMMENDATION

DENNIS GALE CHASE,

      Defendant.

JANIE S. MAYERON, U.S. Magistrate Judge

The above matter came on for hearing before the undersigned upon defendant Dennis Gale Chase's Motion to Suppress Physical Evidence [Docket No. 25] and Motion to Suppress Statements, Admissions and Answers [Docket No. 26].   Assistant United States Attorney Kimberly A. Svendsen appeared on behalf of the Government; and Assistant Federal Defender Douglas Olson appeared on behalf of defendant Dennis Gale Chase, who was personally present.   The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing and post-hearing submissions, and the testimony of FBI Special Agent Richard T. Holden, it is recommended that defendant Dennis Gale Chase's Motion to Suppress Physical Evidence [Docket No. 25] and Motion to Suppress Statements, Admissions and Answers [Docket No. 26] be **DENIED**.

## I.      INTRODUCTION

Defendant Dennis Gale Chase ("Chase") has been charged with one count of receipt of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1) and two counts of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).  Chase seeks to suppress evidence obtained during the execution of a search warrant on September 9, 2009, at his apartment located in Winona, Minnesota, on the basis that the affidavit supporting the warrant (Gov. Ex. 1) for his residence lacked probable cause.  See Memorandum in Support of Motion to Suppress Physical Evidence ("Def.'s Mem."), p. 1.  With regards to subsequent search warrants dated April 23, 2010 and the May 18, 2010 (Govt. Exs. 2, 3), seeking to search a computer hard drive belonging to Chase, and a May 2, 2011 search warrant for his Winona apartment (Govt. Ex. 4), Chase argued that these later-obtained warrants were derived from evidence gathered as a result of the illegal September 9, 2009 search of his residence, and thus, must be suppressed as "derivative fruits" tainted by the first improper warrant. See Def.'s Mem., p. 1.

Chase has also moved to suppress statements he made to law enforcement officers on various occasions, and has rested this motion on the record generated during the motions hearing.  Id. n. 1.

## II.     MOTION TO SUPPRESS EVIDENCE

Chase submitted this motion on the basis of the four corners of the warrants and applications.  As such, the initial issue presented to the Court is whether probable cause existed on the face of the search warrant application to support the issuance of the warrant for the September 8, 2009 search warrant for Chase's Winona apartment.  The

outcome of Chase's challenge to the later-issued warrants depends on this Court's resolution of his challenge to this first search warrant.

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. Illinois v. Gates, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit… including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. Id. at 238-39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Solomon, 432 F.3d 824, 827 (8th

Cir. 2005) (citing United States v Etheridge, 165 F.3d 655, 656 (8th Cir. 1999), quoting

United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995)).

Special Agent Richard T. Holden ("SA Holden"), with the Federal Bureau of

Investigation ("FBI"), applied for a warrant on September 8, 2009 to search Apartment

#308, located at XXX East Fourth Street in Winona, Minnesota.  The warrant was

signed by United States Magistrate Judge Arthur J. Boylan on September 8, 2009, and

executed the same day.  The search warrant authorized the search for internet billing

and use records; records evidencing ownership or use of computers found at the

residence; records evidencing occupancy of the residence; all depictions of minors

engaged in sexually explicit conduct in any format or media; records pertaining to the

possession, receipt, distribution, transportation or advertisement of visual depictions of

minors engaged in sexually explicit conduct, which were transmitted or received using

a computer or other means of interstate commerce; all computer passwords and other

data security devices designed to restrict access to or hide computer software,

documentation, or data; and computers, computer storage media and all related

computer related equipment.  See Govt. Ex. 1, Attachment B.  The affidavit attached to

the warrant provided in pertinent part as follows:

> 28. The National Center for Missing and Exploited Children
> (NCMEC) is a non-profit organization that receives
> complaints via their CyberTipline. The CyberTipline is an
> internet based complaint website that allows Electronic
> Service Providers (ESP's) and private citizens to legally
> forward child pornography for the purpose of investigation.
>
> 29. Ning, Inc. is a social networking site that allows users to
> meet others with similar interests. Users can write blogs,
> chat and exchange songs, photos and videos in different
> groups within Ning.

30. On April 18, 2009 through June 22, 2009, Ning, Inc. submitted CyberTip reports to NCMEC stating that screen name *2ekyttfju7s46*, with associated email address, ForWillieBoy@hotmail.com, uploaded 26 child exploitation videos to the following user groups within Ning; (sic) Cornino, soboyzinhos, Bebezfeet, paixoesporcarros, sashas3, BenficaMarco and Sashas2.

31. On 5/05/2009, an administrative subpoena was served to Hotmail requesting account/subscriber information for email address ForWillieBoy@hotmail.com. Hotmail provided the following information:

> Registration IP:      71.87.108.1185 on 7/28/2008
> at 6:21:59 AM (PDT)
>
> Last IP:      71.87.96.166 on 5/5/2009
> at 7:51:45 am (PDT)
> (Charter Communications)

32. On May 11, 2009, an administrative subpoena was served to ThePlanet.com requesting account/subscriber information for the IP addresses listed in the Hotmail subpoena return:

> 75.125.163.140 on 4/19/2009 at 7:47:29 am PDT
> 75.125.163.140 on 4/19/2009 at 9:32:08 am PDT[1]

ThePlanet.com responded with the following information:

Customer:     Scott Hall

Company:     My Privacy Tools Inc
(masks IP addresses)

Address:     132 North El Camino Real, Ste.415
Encinitas, CA 92024

Phone:     866-275-6615 ext 803

Secondary:     760-481-7669

---

[1]     No information was provided in the affidavit as to why an administrative subpoena was directed to ThePlanet.com.

Email:        scott@myprivacytools.com

Credit card:  xxxx xxxx xxxx 2016
Expiration:   x/x/xxxx

33. On May 11, 2009, an administrative subpoena was served to Charter Communications requesting account/subscriber information for the IP addresses listed in the Hotmail subpoena return:

> 71.87.96.166 on 5/5/2009 at 7:51:45 am PDT
> 75.129.55.73 on 4/27/2009 at 2:52:53 pm PDT
> 75.129.55.195 on 3/17/2009 at 6:36:44 am PDT

Charter Communications provided the following information:

| | |
|---|---|
| Account ID: | 3001209252023140 |
| Name: | Dennis Chase |
| Address: | 165 East 4th Street, Apt 308<br>Winona, Minnesota 55987-3561 |
| Telephone: | 507-313-3262 |
| Type of Service: | Video/ Internet Service |
| Email: | 2chesham@charter.net |

34. On June 19, 2009, an administrative subpoena was served to Charter Communications requesting account/subscriber information for the IP address listed in the Ning CyberTip reports:

> 75.129.55.195 on 3/17/2009 at 13:40:39 z

Charter communications provided the following information:

| | |
|---|---|
| Account ID: | 3001209252023140 |
| Name: | Dennis Chase |
| Address: | 165 East 4th Street, Apt 308<br>Winona, Minnesota 55987-3561 |
| Telephone: | 507-313-3262 |

Type of Service:      Video/Internet Service

Email:                2chesham@charter.net

An AutoTrack search conducted for a Dennis Chase located in Winona, MN provided the following subject:

Name
Last:         Chase
First:        Dennis
MI:           Gale
SSN:          XXX-XX-XXXX
DOB:          09/01/1954
Address:      165 E 4th Street, Apt. 308
              Winona, MN 55987
Telephone:    507-452-1220

35. ISS Ustick downloaded all of the information including the Cybertips from Ning onto two DVDs. I reviewed the information including the folders marked "images." Image file #3049486_video_1959 is a video of a boy being anally penetrated by an adult male's erect penis. Based on the physical size of the boy, the lack of facial hair, undeveloped body and genitalia the boy appears to be ten to twelve years old. The video does not show the adult male's face.

36. I reviewed images folder 3049486_video_3201 which is a video. The video shows a boy lying next to an adult male's erect penis. The adult male forces the boy to perform oral sex on him by physically pushing the boy's head onto his penis. Based on the physical size of the boy, the lack of facial hair, undeveloped body, the boy appears to be eight to ten years old. The video does not show the adult male's face.

37. I reviewed image folder 3116481_video_686 which contains a video of two young boys performing oral sex on each other. Based on the physical size of the boy, the lack of facial hair, undeveloped body and genitalia, the boys appear to be nine to twelve years old.

38. On July 17, 2009, I conducted a surveillance at 165th East 4th Street #308 Winona, MN 55987 and observed "D. Chase 308" on the posted directory inside the apartment building.

<u>CONCLUSION</u>

> 39. Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that contraband, evidence, fruits and instrumentalities 2252 (a) (1) and of violations of Title 2252A(a) (1) (transportation 18 U.S.C. § a visual depiction involving the use of a minor engaging in sexually explicit conduct), Title 18 U.S.C. §§ 2252(a) (4) (B) and 2252A(a) (5) (B) (possession of a visual depiction involving the use of a minor engaging in sexually explicit conduct), and violations of 18 U.S.C. §§ 2252(a) (2) and 2252A(a) (2), (receiving and distributing child pornography) will be found at XXX East 4th Street #308 Winona, Minnesota 55987.

Govt. Ex. 1.

The supporting affidavit also included general information regarding pertinent federal criminal statutes that prohibited transporting, receiving or distributing child pornography, certain information regarding the use of computers to receive, possess and distribute child pornography, as well as the characteristics of those persons who collect child pornography.  <u>Id.</u>, ¶¶ 5-8, 10-27.  With regards to characteristics of child pornography collectors, based on his knowledge and experience SA Holden provided as follows:

> 23.    Child pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location such as their vehicle(s) where it is readily available.  The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media.  The collector is aroused while viewing the collection, and acting on that arousal, he often masturbates thereby fueling and reinforcing his attraction to children.  This is most easily accomplished in the privacy of his own home.

> 24.    Because the collection reveals the otherwise private sexual desires and intent of the collector and represent his

most cherished sexual fantasies, the collector rarely, if ever, disposes the collection.  The collection may be culled and refined over time, but the size of that collection tends to increase.  Individuals who use a collection in the seduction of children or to document that seduction treat the materials as prized possession and are especially unlikely to part with them.  And even if a child pornography collector does delete files from his hard drive or other electronic media. A computer expert can still retrieve these files using a diagnostic tool.

Id., ¶¶ 23, 24.

Chase argued that the SA Holden's affidavit contains little specific information regarding what evidence of a crime might be found at his apartment and merely contains conclusions and speculations.  See Def.'s Mem., p. 1.  Specifically, Chase contended that the affidavit only set forth that SA Holden viewed an image folder that appeared to contain child pornography and did not connect the images to anything involving Chase or what might be found in his apartment.  Id., p. 2.  Chase also intimated that probable cause for the September 8, 2009 search warrant was lacking because the facts relied upon in the affidavit were untimely.  Id., p. 4.  Finally, Chase submitted that the good-faith exception set forth in United States v. Leon[2] did not apply because the warrant was so lacking in probable cause that no officer executing the warrant could have relied on it in good faith.  Id., p. 5.

The Government countered that SA Holden's affidavit set forth specific information tying the CyberTip report to an email account that had uploaded images of child pornography; that this email account was assigned to Chase residing at Apartment #308, XXX East Fourth Street in Winona, Minnesota; that SA Holden had confirmed that Chase resided at this location before application and execution of the warrant; and that

---

[2]      468 U.S. 897 (1984).

SA Holden had set forth evidence indicating that collectors of child pornography retain such materials in their homes.   <u>See</u> Government's Post-Hearing Response to Defendant's Motion to Suppress Physical Evidence, pp. 6-8.   Further, the Government argued that the 2 1/2 to 5 month time period between the alleged downloads of pornographic material and the obtaining of the search warrant did not render the information relied upon for the search warrant stale because child pornography collectors often retain such materials for long periods of time and even if the collector deleted files from the computer hard drive, these files can still be retrieved.   <u>Id.</u>, pp. 8-9. The Government also maintained that the <u>Leon</u> exception was applicable if probable cause was lacking.   <u>Id.</u>, pp. 10-12.

Based on the information provided in the supporting affidavit for the September 8, 2009 search warrant, this Court finds that a reasonable person could conclude that contraband or evidence of a crime might be found in the Winona apartment. Specifically, the affidavit sets forth that SA Holden had learned through the National Center for Missing and Exploited Children ("NCMEC") that a social networking site, Ning, had reported that one of its users with the screen name *2ekyttfju7s46* and associated email address, ForWillieBoy@hotmail.com, had uploaded 26 child exploitation videos to various user groups on the networking site from April 18, 2009 through June 22, 2009.   <u>Id.</u>, ¶¶ 28, 29.   SA Holden viewed the images which included children involved in sexual acts.   <u>Id.</u>, ¶¶ 35-38.   An administrative subpoena to Hotmail for the ForWillieBoy@hotmail.com email address produced information that as of May 5, 2009, the last IP address for this account was 71.87.96.166 via Charter Communications.   <u>Id.</u>, ¶ 31.   Law enforcement then issued a subpoena to Charter

Communications seeking the account and subscriber information for the IP addresses listed in the Hotmail subpoena return, including the May 5, 2009 IP address of 71.87.96.166, and Charter Communications provided that the subscriber with this IP address was Dennis Chase with a physical address of XXX East 4th Street, Apt. 308 Winona, Minnesota. Id., ¶ 33.  Similarly, an administrative subpoena was served on Charter Communications requesting account and subscriber information for the IP address 75.129.55.195 on March 17, 2009 listed in the Ning CyberTip reports, which produced information indicating that Dennis Chase was the account holder with a physical address of XXX East 4th Street, Apt. 308 Winona, Minnesota. Id., ¶ 34.  SA Holden then confirmed that a Dennis Chase lived at the XXX East 4th Street, Apt 308 Winona, Minnesota. Id., ¶¶ 34, 38.

In summary, SA Holden's affidavit connected the uploading of child pornography to an email account assigned to Chase residing at Apartment 308, XXX East 4th Street, Winona, Minnesota.  Further, based on his knowledge and experience, SA Holden established that child pornography collectors almost always maintain and possess their material in the privacy and security of their homes and retain those materials for long periods of time. Id., ¶ 23.  All of this information provided sufficient information to establish a fair probability that evidence of criminal activity related to child pornography would be found at the residence located at Apartment 308, XXX East 4th Street, Winona, Minnesota.

In addition, this Court concludes the information received from Ning for the period of April 18, 2009 through June 22, 2009, upon which the September 8, 2009 search warrant was based, was not stale, considering SA Holden's statements that child

pornography collectors often retain images of minors engaged in sexual contact for long periods of time and that any such files that are deleted from computers can be often be retrieved.  See United States v. Lemon, 590 F.3d 612, 615 (8th Cir. 2010) (concluding that sixteen-month-old evidence of possession of child pornography is not stale as a matter of law, given that "technological advances have increased the ease with which child pornography may be produced, maintained, or distributed-making it all the more likely that the contraband will be retained."); see also United States v. Estey, 595 F.3d 836, 840 (8th Cir. 2010) ("This Court, and others, have held that evidence developed within several months of an application for a search warrant for a child pornography collection and related evidence is not stale.") (citations omitted); United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002) (finding that there is no bright line test for staleness and that a magistrate judge could find that there was a fair probability that the defendant had child pornography at his home three months after the intercepted transfer, based on the agent's professional experience that child pornographers generally retain their pornography for extended periods of time); United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999) (citations omitted) ("The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated.").

For all of the reasons stated above, Chase's motion to suppress evidence obtained from the September 9, 2009 search warrant should be denied.  In light of this Court's determination that this warrant was properly issued, Chase's motion to suppress

the later-obtained warrants should also be denied, as the only basis for challenging the subsequent warrants of Chase's computer and apartment was that these warrants were derivative fruits of and tainted by the September 2009 warrant.

## III.   MOTION TO SUPPRESS STATEMENTS, ADMISSIONS AND ANSWERS

SA Holden's testimony at the hearing bearing on Chase's motion suppress to suppress statements was as follows:  On September 9, 2009 at 8:30 a.m., SA Holden participated in the execution of a search warrant at Chase's apartment located in Winona, Minnesota.   Upon arrival, officers announced that they had a search warrant and Chase opened door and let the officers into his apartment.   Present during the search were Chase, SA Holden and three Winona police investigators.   Chase was told that law enforcement was there to execute a search warrant, that he was not under arrest and that he was free to leave.   During the search, SA Holden asked Chase if he would talk to him.   Chase was told that he was not required to answer questions and that he could leave.   Chase agreed to talk to law enforcement.   No <u>Miranda</u> warnings were given to him prior to this interview.   The interview took place at the kitchen table in Chase's apartment and involved SA Holden as well as a Winona police investigator. The officers were dressed in casual street clothing.   The tone of the interview was described as casual and low key.   Officers asked questions regarding whether any other people had access to his apartment or the computers within the apartment.   SA Holden testified that the officers never yelled at Chase, threatened him, made promises to him or touched his person.   Chase was polite and cooperative during the interview. According to SA Holden, Chase did not appear to be intoxicated by drugs or alcohol during the interview, he appeared to understand the questions posed to him and his

responses were appropriate.  The interview was concluded, by law enforcement telling Chase that they were taking items from the apartment and then the officers left.  Chase was not placed under arrest.  The interview lasted for approximately 30-40 minutes and at no time did Chase ask to stop the interview nor did he ask for an attorney.

On February 19, 2010, SA Holden had learned that a computer repair technician had notified police that a computer brought in for repair by Chase had child pornography on it and that Chase had been arrested and released by Winona Police.  On the same day, Chase had called the Winona Police Department and asked to speak to an investigator and the Winona Police Department contacted SA Holden.  The interview of Chase took place in Chase's mother apartment, which was located in the same complex as Chase's apartment.   SA Holden, a Winona police investigator, Chase and his mother were present during the meeting.  Chase opened the door, and let the officers into the apartment.  They proceeded to the living room and sat down.  The officers were in casual street clothing and no firearms were displayed.  The tone of the interview was described as casual and low key.  The meeting began by Chase telling the officers that he wanted to ensure that his nephew's data on the computer that Chase had been using was not deleted.  SA Holden testified that the officers never yelled at Chase, threatened him, made promises to him or touched his person.  According to SA Holden, Chase did not appear to be intoxicated by drugs or alcohol during the interview, appeared to understand the questions posed to him and his responses were appropriate.  Chase refused to answer any questions about what was on the computer, except to say that he wanted to ensure that data involving his nephew on the seized computer was not deleted.  Chase never asked for an attorney during the meeting.  The

meeting concluded when Chase refused to answer any questions regarding what was on the computer.  The interview lasted 5 to 10 minutes.  Chase was not arrested at this time and the officers left the apartment.

On May 4, 2011, at 8:04 a.m. SA Holden, another FBI agent (SA Rohrbaugh), and two Winona police investigators executed a search warrant for Chase's apartment and an arrest warrant for Chase.   Officers approached the apartment, knocked and identified themselves, and announced that they had a search warrant for apartment. Chase was hesitant to open the door because he was naked.  He was told by officers that he had to be escorted to his room to get dressed for officer safety.  Chase was informed by officers that they were at his apartment with a search and arrest warrant and that he was going to be arrested.  Chase was not handcuffed during the search. SA Holden testified that he observed an open beer can in the apartment and Chase asked if he could finish his beer.  He was not allowed to do so. Chase was allowed to go to the bathroom and have a drink of water.  SA Holden asked Chase why he wanted to drink, and Chase responded that he was an alcoholic.   During the search, SA Holden spoke with Chase and before talking he was presented with an Advice of Rights Form. See Govt. Ex. 5.[3]  Chase was allowed to read the form and appeared to understand the

---

[3]     This form stated:

YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

form.  SA Holden asked Chase if he had any questions regarding the form, and Chase replied, "No."  Chase signed the Advice of Rights Form.  See Govt. Ex. 5.

SA Rohrbaugh asked Chase about some of the items that were going to be seized.  The questions took place in the apartment kitchen.  Law enforcement officers were dressed in street clothing.  Firearms were visible.  The tone of the interview was described as casual.  SA Holden testified that the officers never yelled at Chase, threatened him, made promises to him or touched his person.  Chase did not appear to be intoxicated by drugs or alcohol during the interview, despite the one open can of beer.  There was no slurring of speech or stumbling by Chase and it did not appear he had been up all night drinking.  Chase appeared to understand the questions posed to him and his responses were appropriate.  Chase was polite and cooperative.

The interview concluded by officers telling Chase that he was going to be arrested and transported to Minneapolis.  SA Holden testified that the interview lasted for approximately 30-40 minutes and officers were in the apartment for two-and-half

---

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present.

See Govt. Ex. 5.

hours.  Chase never asked that the interview stop and only refused to provide certain passwords to his computer.  Chase never asked for an attorney.

During his transport to Minneapolis, SA Holden sat next to Chase in the back passenger seat, while SA Rohrbaugh drove.   Approximately 30-40 minutes into the drive to Minneapolis, Chase asked SA Rohrbaugh about what was going to happen next.  SA Rohrbaugh told Chase about the court appearance procedures.  Rohrbaugh then told Chase that if he did not change his behavior, he would be in contact with law enforcement more often.  Chase stated that he was not going to change his behavior and he did not mind being contacted by law enforcement every twenty months.  SA Rohrbaugh told Chase that if he did not change his behavior, the consequences would become more dire, and Chase replied that he was not going to change his behavior because he did not think it was morally wrong to collect and distribute child pornography, and he thought that the law should be changed.

Based on the totality of the circumstances, this Court finds that none of the statements made by Chase should be suppressed.

Miranda v. Arizona requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). Therefore, the protections afforded by Miranda are triggered when an individual "is both in custody and being interrogated."  United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.), cert. denied, 503 U.S. 1011 (1992)).  "Custody occurs either upon formal arrest or under any other

circumstances where the suspect is deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

When determining whether a suspect is in custody, courts consider the following six "indicia of custody":

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during the questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated;  and

(6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349;[4] see also, e.g., United States v. Axsom, 289 F.3d 496 (8th Cir. 2002).  The first three factors are considered "mitigating factors" which, if found, tend to show that the suspect was not in custody.  Griffin, 922 F.2d at 1349.  The remaining three factors are characterized as "coercive factors" which, if found, tend to show the existence of custody.  Id.

---

[4]     This Court notes that some Eighth Circuit decisions have not applied the Griffin factors in a formulaic manner.  See, e.g., United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir .2006).  However, the Eighth Circuit continues to examine the Griffin factors in its analysis of custody.  See, e.g., United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009).

The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." <u>Griffin</u>, 922 F.2d at 1347 (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984)).  Moreover, the determination is based on the totality of the circumstances, with none of the factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor.  <u>Id.</u> at 1347.  The ultimate inquiry is whether there was a formal arrest or restraint on a defendant's movement of the degree associated with a formal arrest. <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1995).

As a preliminary matter, the Court finds that Chase was not in custody when he made statements to law enforcement on September 9, 2009 and February 19, 2010, and therefore, no <u>Miranda</u> warning was required.  With regards to the September 9, 2009 encounter, Chase was told that he could leave during the search of his residence and when asked to give a statement, he was told that he did not have give a statement and that he could leave.  Chase voluntarily talked to law enforcement and no strong-arm tactics or deceptive stratagems were used against him in order to elicit a statement. Chase was not in any way restrained during the interaction.  The Court also finds that the atmosphere was not police-dominated given that the interview took place in his apartment.  Finally, after the interview was completed, Chase was not placed under arrest and the law enforcement officers left him at his apartment.

As to the February 19, 2010 statement, Chase initiated contact with law enforcement by calling the Winona Police Department to arrange a meeting.  Chase

was not restrained in any way.  No strong-arm tactics or deceptive stratagems were employed during the conversation.  The atmosphere was not police-dominated as the conversation took place in his mother's apartment with her present.  Finally, law enforcement left when Chase would not provide them with any more information and he was not arrested after the meeting.

Based on the totality of the circumstances, the Court finds that Chase was not in custody for the purposes of <u>Miranda</u>, and therefore, suppression of any statements he made on September 9, 2009 and February 19, 2010 is not warranted.

Further, the Court finds that the statement Chase gave to law enforcement on May 4, 2011 in his apartment during his arrest and after he was read his <u>Miranda</u> rights amounted to a knowingly and voluntary waiver of his <u>Miranda</u> rights.  A waiver of <u>Miranda</u> rights is valid if it satisfies the following criteria:  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (citing <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994)).  "The determination of whether an accused has knowingly and voluntarily waived his <u>Miranda</u> rights depends on all the facts of each particular case." <u>Stumes v. Solem</u>, 752 F.2d 317, 320 (8th Cir. 1985) (citing <u>Fare v. Michael C.</u>, 442 U.S. 707, 724-25 (1979)).  Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's <u>Miranda</u> rights

have been waived.  See Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare, 442 U.S. at 725).

SA Holden testified that Chase was presented with an Advice of Rights form and read and signed it before he was interviewed.  SA Holden further testified that Chase appeared to understand the questions he was being asked, his speech was not slurred and that he did not appear to be under the influence of alcohol or controlled substances to the point he could not understand or comprehend what was happening.  No evidence was presented to suggest that law enforcement coerced Chase or tricked him into waiving his Miranda rights or giving a statement.  Given the totality of the circumstances surrounding the interrogation, the Court concludes that Chase knowingly waived his Miranda rights.

As for the statements Chase made during the May 4, 2011 transport to Minneapolis, after his arrest and Mirandized statement, the Court finds that these statements were made without any significant lapse in time from when he had been provided with his Miranda rights, and it was not necessary to reissue Miranda warnings for the car ride.  See Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (notwithstanding a five-hour break between first and second interviews, a fresh set of Miranda warnings was not required for the second interview where defendant demonstrated awareness of his rights); United States v. Nordling, 804 F.2d 1466, 1471 (9th Cir. 1986) (new warnings not required when "no appreciable time had elapsed" between two interrogations).  Moreover, having concluded that Chase knowingly and voluntarily waived his Miranda rights shortly before his transport, the Court finds that the

statements he made to the FBI agents during the transport were knowingly and voluntarily made and without any coercion.

For all of the reasons stated above, Chase's Motion to Suppress Statements, Admissions and Answers should be denied.

## IV.   RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.     Dennis Gale Chase's Motion to Suppress Physical Evidence [Docket No. 25] be **DENIED**; and

2.     Dennis Gale Chase's Motion to Suppress Statements, Admissions and Answers [Docket No. 26] be **DENIED**.

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Dated:        August 22, 2011

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **September 2, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **September 2, 2011**.